(C. D. 405)

Geo. S. Bush & Co., Inc. v. United States

United States Customs Court, Second Division

(Decided December 9, 1940)

*Lawrence & Tuttle (George R. Tuttle* of counsel) for the plaintiff.
*Charles D. Lawrence,* Acting Assistant Attorney General (*Daniel G. McGrath* and *Joseph E. Weil,* special attorneys), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

TILSON, Judge: The question involved in this suit against the United States is the proper classification of certain imported merchandise which was classified by the collector as silk fishing lines and duty levied thereon at the rate of 60 per centum under paragraph 1211 of the Tariff Act of 1922, which provides as follows:

All manufactures of silk, or of which silk is the component material of chief value, not specially provided for, 60 per centum ad valorem.

The plaintiff makes claim for lower rates of duty under the following paragraphs:

PAR. 344. Fishhooks, fishing rods and reels, artificial flies, artificial baits, snelled hooks, leaders or casts, and all other fishing tackle and parts thereof, fly books, fly boxes, fishing baskets or creels, finished or unfinished, not specially provided for, except fishing lines, fishing nets, and seines, 45 per centum ad valorem.

PAR. 1201. Silk partially manufactured, including total or partial degumming other than in the reeling process, from raw silk, waste silk, or cocoons, or silk and artificial silk, and silk noils exceeding two inches in length; all the foregoing not twisted or spun, 35 per centum ad valorem.

PAR. 1202. Spun silk or schappe silk yarn, or yarn of silk and artificial silk, and roving, in skeins, cops or warps, if not bleached, dyed, colored, or advanced beyond the condition of singles by grouping or twisting two or more yarns together, on all numbers up to and including number 205, 45 cents per pound, and in addition thereto ten one-hundredths of 1 cent per number per pound; exceeding number 205, 45 cents per pound, and in addition thereto fifteen one-hundredths of 1 cent per number per pound; if advanced beyond the condition of singles by grouping or twisting two or more yarns together, the specific rate on the single yarn and in addition thereto 5 cents per pound cumulative; if bleached, dyed, or colored, the specific rate on unbleached yarn and in addition thereto 10 cents per pound cumulative: *Provided,* That any of the foregoing on bobbins, spools, or beams, shall pay the foregoing specific rates, according to the character of

the yarn or roving, and in addition thereto 10 cents per pound: *Provided further,* That none of the foregoing single yarn or roving shall pay a less rate of duty than 40 per centum ad valorem: *And provided further,* That none of the foregoing two or more ply yarn shall pay a less rate of duty than 45 per centum ad valorem. In assessing duty on all spun silk or schappe silk yarn, or yarn of silk and artificial silk, and roving, the number indicating the size of the yarn or roving shall be determined by the number of kilometers that weigh one kilogram, and shall, in all cases, refer to the size of the singles: *And provided further,* That in no case shall the duty be assessed on a less number of yards than is marked on the skeins, bobbins, cops, spools, or beams.

PAR. 1204. Sewing silk, twist, floss, and silk threads or yarns of any description, made from raw silk, not specially provided for * * * if ungummed, wholly or in part, or if further advanced by any process of manufacture, $1.50 per pound, but not less than 40 per centum ad valorem.

PAR. 1459. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

The classification of merchandise of the same character as that now before us has been the subject of litigation before this court in the following cases: *Takeuchi* v. *United States,* Abstract 12254; *Kindel & Graham* v. *United States,* Abstract 16358; *Bush* v. *United States,* Abstract 20714, and 21 C. C. P. A. 100; *American Import Co.* v. *United States,* Abstract 31025, and *American Import Co.* v. *United States,* T. D. 48804, and 26 C. C. P. A. 72. In all of this litigation different issues have been presented and the cases have all been submitted on different records, some of which have not been as full and complete as they might have been.

In his brief filed herein, counsel for the plaintiff, after briefly reviewing the above litigation before this court and the appellate court, makes the following statement:

From the above decisions it may be seen that these cases have not squarely presented the issue under paragraph 1204; for in both the Takeuchi and Okuda decisions it was held that the evidence failed to establish that the merchandise was not fishing lines. Therefore the present case is intended to establish (1) that the merchandise is not a fishing line but is, in the words of Judge Tilson (T. D. 48802) "nothing more than a mere material", and (2) that it is "silk threads or yarns of any description, made from raw silk."

In the present case seven witnesses testified for the plaintiff and but one witness testified for the defendant. Upon discovering that the defendant's witness had not seen the merchandise in the *Okuda* case, *supra,* he was not interrogated further and the few words of testimony he gave need not be considered.

Samples and illustrative samples of the imported merchandise were admitted in evidence and are now before us and have had our careful examination and consideration.

The evidence shows that the merchandise, as imported, comes in lengths of from 10 to 100 yards and in strengths of from No. 1 to No.

30, No. 1 representing one-half-pound test and No. 30 representing 150 pounds test, and the other numbers representing the pound tests between one-half pound and 150 pounds.

One witness who had been in Japan and observed the manufacture of merchandise similar to the instant merchandise described the process of manufacture as follows: This merchandise is made entirely from thrown silk; thrown silk is a fine filament of pure silk as it comes from the silk cocoon; when the process of manufacturing the instant merchandise was commenced this pure silk from the cocoon was placed on spools approximately 10 to 12 inches high and approximately 2 feet in circumference, containing thousands of yards of a continuous length of the silk filament; these spools are then taken to a shed about 100 yards long, and there put on a rack and an operator stands in front of a reel and, taking each individual silk fiber, brings it up to a spindle; whether the fibers from one or more spools are used is determined by the thickness of the strand they wish to produce; these spools are fastened to a bobbin and the operator revolves a wheel which spins these filaments into one continuous line; the bobbins move and twist the strand.

Referring particularly to the bobbin and the manufacture of this merchandise in general, the witness testified further:

They move lengthwise the shed. In other words, to make it clear, they are making a line, a sort of rope, hundreds of these little strands, or any number they want—the more strands they use the thicker the rope is going to be; I can't tell from this how many strands are in there, probably 50 strands to make up this size. After this is run the length of the shed, the operator has a strand approximately like a portion of Exhibit No. 2 on this. Now this is rewound on big spools and transported from there up to the back country, where the water is pure, so they can produce the process of coating this merchandise.

The merchandise is coated with a composition of formalin and gelatin; this is heated in a tank so it is in suspension; the completed strand of fiber is unwound and passed through the tank in one continuous line; after passing the thread or this strand through this tank, the operator walks the full length of the shed, carrying the end of the strand in his hand and it is attached to the poles of the shed for the purpose of drying; so after walking the length of the shed any number of times the operator has the entire poles covered with thousands and thousands of yards of this filament. After these filaments have dried they are taken down and rewound on spools. As these yarns or threads are drying they are subjected to a polishing process. After this it is brought back to the depot and there dyed to the desired colors, and is then ready for the market.

The former chief examiner of merchandise at San Francisco testified that the instant merchandise "is a yarn." A Government chemist who examined the merchandise testified: "I found it to be a single strand of silk, composed of approximately 30 individual silk filaments,

partially degummed." This testimony that the merchandise "is a yarn" and that it is partially degummed, as well as the testimony that it is made from raw silk, was not controverted by any one. It may well be assumed that if the defendant had been able to do so it would have produced evidence to contradict the above testimony.

Considerable testimony was offered tending to show how this merchandise is used after importation. It is a well-settled principle in customs law that in the absence of deception, disguise, or artifice resorted to for the purpose of perpetrating a fraud upon the revenue, imported merchandise must be classified with reference to its condition when imported. *Frankenberg* v. *United States*, 206 U. S. 224; *United States* v. *Schoveling*, 146 U. S. 76; *Worthington* v. *Robbins*, 139 U. S. 337; *Dwight* v. *Merritt*, 140 U. S. 213, and *United States* v. *Citroen*, 223 U. S. 407.

Since there is no intimation of fraud in this case, the merchandise must be classified with reference to its condition when imported. In its imported condition this merchandise was neither fishing lines nor leaders, but, according to the evidence, was yarn, partially degummed, made from raw silk.

While said paragraph 1204 makes specific provision for "Sewing silk," it is to be noted that plaintiff does not claim under that particular part of the paragraph, but under that part which provides for "silk threads or yarns of any description made from raw silk." Therefore, when it is established that the merchandise is threads or yarns of any description made from raw silk, any other description of the merchandise would appear to be immaterial.

While in the case of *Klump* v. *Thomas*, 108 Fed. 799, the merchandise consisted of threads made from yarn composed of flax, hemp, or ramie, the law, as there construed, appears to be here applicable. The following is quoted from said decision:

The material involved in this case consists of hanks of two strands of flax twisted together, and is therefore a "manufacture of flax"; but, though this is plain, still the crucial question remains, is it an article which Congress has designated by the specific name of "thread"? If it is, it was rightly classified under that designation. *Twine Co.* v. *Worthington*, 141 U. S. 474, 12 Sup. Ct. 55, 35 L. Ed. 821.

If it were necessary, as the plaintiffs seem to suppose, to distinguish thread from yarn, it would, I think, be difficult to point out any difference upon which, for the purposes of this case, such distinction could be rested. The dictionary definition of either of these words would be inclusive of this merchandise, and the evidence shows that each of them is commercially applied to it. Therefore, while it cannot be said that it is not yarn, it is equally certain that it is thread. It is "thread" * * * made from yarn," and Congress having so designated it, did all that was necessary for its identification. It was not requisite that it should be called by every name which might properly have been given to it. I quite agree that, though to a limited extent and for restricted purposes it may be used for sewing, it could not have been classified as a sewing thread; but the obvious answer to the

argument which has been based upon this fact is that it has not been so classified, and that the act makes no provision for any such classification. Indeed, I think it is clear that in paragraph 330, by thread made from yarn, there was intended (as some of the witnesses have testified is their understanding of the meaning of the word "thread") two or more strands of yarn twisted together, as distinguished from "single yarns," which are dealt with in the following paragraph; in other words, that, for certainty of description, the term "single yarns" was employed when but one strand was referred to, but that, where articles composed of more than one strand were in mind, the word "threads" alone was used, as being precisely apt, and, of itself, sufficiently defining. * * *

In this case, as in the *Klump* case, *supra*, it might be said that to a limited extent and for restricted purposes this merchandise may be used for sewing, but it could not have been classified as a sewing thread. The obvious answer to such argument is that it has not been so classified and no claim is made for classification of the merchandise as sewing thread. It is not reasonable to suppose that the Congress intended to include within the provisions of said paragraph 1204 only such threads or yarns as were chiefly used in sewing. A reading of said paragraph is convincing that it is not so limited.

The merchandise cannot be held dutiable under paragraph 304 of said act, as leaders or casts, and all other fishing tackle and parts thereof, finished or unfinished, not specially provided for, for the reason that under the evidence, and the authority of *United States* v. *The Harding Co.*, 21 C. C. P. A. 307, it is nothing more than mere material out of which such articles might be made.

As between the two provisions, the first in said paragraph 1211 for all manufactures of silk, not specially provided for, and the second in paragraph 1204 for silk threads or yarns of any description made from raw silk, not specially provided for, if ungummed, wholly or in part, or if further advanced by any process of manufacture, the latter is obviously the more specific, and, since the merchandise in this case answers all the requirements of said paragraph 1204, it is dutiable thereunder at $1.50 per pound, but not less than 40 per centum ad valorem.

Paragraph 1211 is a catch-all provision for all manufactures of silk, not specially provided for, while paragraph 1204 makes specific provision for silk threads or yarns of any description made from raw silk, not specially provided for, if ungummed, wholly or in part, or if further advanced by any method of manufacture. It cannot be denied that the instant merchandise is a manufacture of *raw* silk and since paragraph 1211 provided only for manufactures of silk, and makes no provision for manufactures of *raw* silk, the question of whether or not a manufacture of raw silk could be held dutiable under a provision for manufactures of silk, is not free from doubt.

However, if we should hold that the provision in said paragraph 1211 for manufactures of silk, covered and included manufactures of

*raw* silk, we would, nevertheless, be compelled to hold the instant merchandise, consisting of threads or yarns made from raw silk, ungummed, wholly or in part, or further advanced by any process of manufacture, more specifically covered by and included in said paragraph 1204 than by the catch-all provision of said paragraph 1211. All silk threads or yarns are manufactures of silk but not all manufactures of silk are silk threads or yarns.

As supporting our conclusion that the provisions of paragraph 1204 are more specific than are those of paragraph 1211, we cite the following authorities: *United States* v. *Decorative Novelty Co.*, 17 C. C. P. A. 211; *United States* v. *American Import Co.*, 17 C. C. P. A. 212; *United States* v. *Vandegrift*, 3 Ct. Cust. Appls. 161; and *Thomsen* v. *United States*, 2 Ct. Cust. Appls. 37.

In the *Thomsen* case, *supra*, the appellate court, in passing upon the relative specificity of the provision for baskets of wood, if stained, dyed, painted, printed, polished, grained, or creosoted, and the provision for manufactures of chip, not specially provided for, contained in the act of 1909, the court said:

> The term "baskets," being the name of the articles, seems clearly to be a more exact and specific designation of them than the term "manufactures." This latter term in this application is one of general description only. The fact that the component material is more specifically described in the second paragraph does not conflict with this conclusion, for nevertheless the term baskets is the exact and specific name of the article itself.

The above decision was later approved and followed by the appellate court in the case of *United States* v. *Decorative Novelty Co.*, *supra*, and also in the case of *United States* v. *American Import Co.*, 17 C. C. P. A. 212.

In the case of *United States* v. *Parry*, 14 Ct. Cust. Appls. 172, the appellate court, in passing upon the relative specificity of a provision for equipment not specially provided for and a provision for leather shoes, said:

> The goods are certainly shoes in chief value of leather; and as such shoes are *eo nomine* provided for in paragraph 1607, that paragraph must be preferred for the classification of the goods when brought in competition with paragraph 1402, which provides for equipment for football games not specially provided for and not for shoes for football games. Shoes with cleats are used by lumbermen as footwear for walking in wooded areas and also by hunters and foot racers. Shoes made with a hinged cleat are also worn to prevent slipping on the ice. It is apparent, therefore, that the attaching to shoes of cleats or spikes, or other appliances for a special purpose, does not remove such footwear from the category of shoes. * * *
>
> As shoes are specifically provided for in paragraph 1607 we are of the opinion that the importation was entitled to free entry * * *.

In the case of *American Net & Twine Co.* v. *Worthington*, 141 U. S. 468, 35 L. Ed. 821, the competition was between a provision for "flax or linen threads, twine, and pack thread and all manufactures of

flax, or of which flax shall be the component material of chief value, not specially enumerated or provided for in this Act," and a provision for "seines and seine and gilling twine." In holding the latter provision to be the more specific, the Supreme Court of the United States said:

While in the absence of a more specific designation this article might properly be classed as linen thread, it is a familiar rule in revenue cases that, where Congress has designated an article by a specific name and imposed a duty upon it, general terms in the same Act, though sufficiently broad to comprehend such article, are not applicable to it; in other words the article will be classified by its specific designation rather than under a general description. *Homer* v. *The Collector*, 68 U. S. 1 Wall. 486 (17: 688); *Arthur* v. *Lahey*, 96 U. S. 112 (24: 766); *Arthur* v. *Stephani*, 96 U. S. 125 (24: 771); *Movius* v. *Arthur*, 95 U. S. 144 (24: 420).

We think the intention of Congress that these goods should be classified as "gilling twine," is plain; but were the question one of doubt, we should still feel obliged to resolve that doubt in favor of the importer, since the intention of Congress to impose a higher duty should be expressed in clear and unambiguous language. *United States* v. *Isham*, 84 U. S. 17 Wall. 496 (21: 728); *Hartranft* v. *Wiegmann*, 121 U. S. 709 (30: 1012); *Gurr* v. *Scudds*, 11 Exch. 190.

The judgment of the court below will therefore be reversed, and the case remanded for further proceedings in conformity with this opinion.

On the record presented, following the authorities herein quoted and cited, and for the reasons stated, we hold the merchandise which was assessed with duty at 60 per centum under paragraph 1211 to be properly dutiable, as claimed by the plaintiff, at $1.50 per pound, but not less than 40 per centum ad valorem under paragraph 1204 of the Tariff Act of 1930. Judgment will be rendered accordingly.